UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RONALD BETHUNE, on behalf of himself and all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>LENDINGCLUB CORPORATION; WEBBANK, STEEL PARTNERS HOLDINGS, L.P.; THE LENDING CLUB MEMBERS TRUST; and DOES 1 through 10, inclusive,<br><br>  Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1.  **VIOLATION OF N.Y. GEN. OBLIG. LAW § 5-501 (CIVIL USURY)**<br><br>2.  **VIOLATION OF INDIVIDUAL STATE CIVIL USURY LAWS**<br><br>3.  **VIOLATION OF 18 U.S.C. § 1962 (C) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**<br><br>4.  **VIOLATION OF 18 U.S.C. § 1962 (D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**<br><br>5.  **VIOLATION OF N.Y. GEN. BUSINESS LAW § 349 (NEW YORK CONSUMER PROTECTION ACT)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Ronald Bethune, an individual, on behalf of himself and on behalf of all others similarly situated (*i.e.*, the members of the Plaintiff Class described and defined within this Complaint), herein alleges as follows based on information and belief for all times relevant:

# I

# OVERVIEW

**A.      Lending Club Corporation's Consumer Lending Model**

1.      Defendant Lending Club Corporation (hereinafter referred to as "LCC")
developed an eight billion dollar consumer lending business based on cutting out the banks from
the personal consumer loan process, and replacing it with an internet-based matching system
where private investors fund private borrowers' personal loans, with LCC assuming the role of
the bank to facilitate and service the loans.



2.      In creating this business model that cuts out the banks from the consumer lending business, LCC, which is not a bank subject to any banking regulation oversight, assumed all of the non-funding aspects of a traditional consumer bank.  It solicited and marketed consumers to submit consumer loan applications for funding.  It created the consumer loan application (including giving LCC power of attorney), and established the loan criteria for these consumer loans, including the type of loan, the amount of loan, the information that must be submitted to apply for the loan, and the minimum credit criteria that the borrower must meet to submit a loan request.

3.      LCC then performed the traditional bank function of performing the credit analysis to assess the creditworthiness of the borrower, and based on that analysis, set the interest rate and repayment terms for the borrower's promissory note.  LCC then generated and implemented the standardized borrower's promissory note.

4.      In furtherance of its banking function, LCC then made available to individual investors on the Lending Club website the inventory of borrowers' consumer loan requests, including the credit information provided by the borrowers as well as that obtained by LCC, the terms of the notes, including length of the notes, the interest rates, and a grading letter – all of which were established by LCC.  Investors would agree to fund the loan, or a portion of a loan, or a group of loans in which the individual consumer loan is one of the loans.  Once the investor, or a group of investors, agreed to fund the loan and entered into a contract with LCC to fund the loan, LCC arranged for the investors to fund the loan and finalized the borrower's note with LCC having power of attorney for the borrower.

5.      The borrower then received the approved loan amount less at least a 5% loan origination fee.  Following the several steps as discussed below and a step discussed below, LCC

obtained and held the notes in an entity it created -- Defendant The Lending Club Members Trust

(hereinafter referred to as "LCMT").  The investors did not actually receive the borrower's note

in exchange for their funding the consumer note.  Instead, they received a note from LCC, that

provided the investor the right to receive the principal and interest (minus a 1% servicing fee)

that the borrower pays back on the note.  This arrangement provided that LCC is the holder and

the servicer of the note.  LCC also had the right to pursue nonperforming notes.

**B.     A Large Percentage of These LCC Notes Violate State Consumer Usury Laws**

        6.      There is nothing that Plaintiff alleges was illegal or improper about the above

described business model of LCC, with the very significant exception that a large percentage of

the notes that LCC has entered into with individual consumers, including Plaintiff, carry an

interest rate that violates the state law where the borrower resides.  Most states have usury laws

that establish the maximum interest rate individuals may charge individual consumers for general

promissory notes.  For Plaintiff, his promissory note carried with it a 29.97% interest rate.  That

is almost double the maximum allowable interest rate of 16% for individual lenders loaning

money to individual borrowers, pursuant to N.Y. Gen. Oblig. Law § 5-501 (civil usury

violation), and well over the 25% maximum interest rate to constitute a criminal civil usury

violation in New York, pursuant to N.Y. Penal Law § 190.40.

        7.      When LCC set up its business model, it was aware that the loans it was

orchestrating violated many, if not most state usury laws, including New York's state usury law.

It also knew that many banks were able to circumvent state usury laws by being able to apply the

laws of their own home states (where there were not statutory usury laws), to loan money in

states that had usury laws.

8.      A dual system of interest rate schedules exists in the United States.  On one hand, when individuals loan money to borrowers, the terms of the loan are governed by the usury law in the state in which the agreement was formed.  The usury laws are vital to controlling both the lending practice of non-bona fide lending institutions who elect to extend financing to other individuals and protecting the individuals who receive such loans from excessive and unreasonable interest rates.

9.      On the other, bona fide lending institutions, such as banks, are able to export the law of the state in which the lending institution resides.  For institutions residing in states without usury laws – such as Utah – the institutions are permitted to lend money without being subjected to usury laws.

10.     One court explained that the rationale behind this dual system of interest rate schedules centers on the reality that there exists greater governmental authority and oversight in regard to bona fide lending institutions.  In short, because bona fide lending institutions are regulated by the government – and thus are already subject to various federal and state regulations when lending money – and individual lenders are not, the strict usury law limitations need only apply to lenders not operating through a bona fide lending institution.

**C.      LCC Inserted a Sham Pass Through Bank Into the Lending Process to Circumvent State Usury Laws**

11.     LCC had several choices.  First, it could have loaned money to borrowers that were good reasonable credit risks at interest rates at or below state usury laws.  Second, LCC could have established itself as a bank in a state without usury loans, with the resulting regulatory and governmental oversight over disclosures and unconscionable consumer loans, and loaned money at the interest rate allowed by the state in which the bank was established.  And

third, LCC could have built into its model that a legitimate bank from a state without usury laws could loan the money and service the loan.  But LCC took none of the legitimate options, and instead, elected a to actively circumvent state usury laws, while avoiding sharing a significant share of the income with a legitimate banking institution, or being forced to accept the regulatory and governmental oversight of the marketing, sale, and servicing of its loans.  LCC elected to create the illusion that a bank (without usury rate limitations) was lending the funds to the borrowers, so as to attempt to legitimize the otherwise usurious loans.

12.      At all times relevant, Defendant WebBank was a Utah state chartered industrial bank located in Salt Lake City.  WebBank is fully owned and controlled by a non-financial institution entity named Steel Partners Holdings, L.P. (collectively referred to as "WebBank").  WebBank did not have bank offices, or perform most of the functions of a consumer bank.  Further, as an industrial bank, it had very little oversight or regulation by the government or regulators.  However, what WebBank did have was a headquarters in the state of Utah, which does not have state usury laws.

13.       So the "creative" solution utilized by LCC was to enter into a contract with WebBank where WebBank would be involved as a "pass through" sham party to the transaction.  WebBank would act as the funding agent and enter into the note with the individual borrowers, and then within two business days transfer the note to LCC.  LCC would then transfer the investors' funding to WebBank.  LCC would then share some portion of the loan origination fee with WebBank to compensate it for its participation in this sham lending transaction.

14.      This additional step in the lending process provided no value to the consumer, investors, or LCC, except as an attempt to legitimize the usurious interest rates by claiming that

the lending institution was WebBank operating under its Utah state charter and, therefore, Utah law – and its lack of prohibition against usurious interest rates, officially sanctioned these loans.

15.     But this use of WebBank was a pretext and a sham.  WebBank did not serve any of the traditional banking functions with the consumer loan, such as:

- setting the parameters of the loans, such as type, risk, amount, and use;

- deciding what information to obtain from borrowers;

- determining credit score or otherwise evaluating the borrower;

- setting the interest rate, fees, payment terms, or length of the loan;

- assuming any risk in lending the money (inasmuch as LCC had the individual investor funds committed before WebBank provided the funds and LCC agreement to reimburse WebBank within two days);

- having any right or intent to keep the note (as it was contractually required to transfer the note to LCC within 48 hours of funding);

- having any servicing obligations on the note.; and

- having any recourse obligations on the note.

16.     In all respects, WebBank's role was as a pass through entity.  Indeed, the former President and CEO of WebBank, Gerry Smith, admitted in an April 2015 Bloomberg story that "[o]ne of the beauties of these partnerships is you don't have to devote much capital to it. You're more of a pass-through."  In 2015, Web Bank held only $226 million in assets while purportedly funding almost $4 billion in loans for LCC.  The graphic provided by LCC on the homepage of it website to educate both the investors and consumer borrowers about the transaction is clear -- LCC is the middle agent between the investors and the borrowers, while WebBank is not depicted as having any role in the transaction.

7



17.     That is because WebBank had only a sham role in the lending transaction until February 26, 2016, when this arrangement began to draw attention from the regulators, the courts, and shareholders, and the business model was changed to have more involvement by WebBank.  But from the beginning of the class period to February 26, 2016, WebBank was not a real party in interest to the consumer loans made by LCC to consumers through the use of funding by private investors, and the pass through funding was a sham transaction designed solely to attempt and circumvent state usury laws.

**D.     Defendants Have Violated State Usury Laws for Each Loan Made Within the Class Period That Carries an Interest Rate Above the State Usury Law Where the Consumer Resides**

18.     Plaintiff resides in the state of New York.  As such, any private consumer loan made to Plaintiff by LCC in New York could not legally exceed 16% interest, pursuant to N.Y. Gen. Oblig. Law § 5-501.  The loan made to Plaintiff by real party in interest LCC in June 2015 was at 29.97% interest and, therefore, violated N.Y. Gen. Oblig. Law § 5-501.  Similarly, a

substantial number of the total loans made by real party in interest LCC to consumers, were made to consumers at interest rates that exceeded the maximum allowable interest rate under the usury laws of the states in which those consumers resided.

19.     This actions taken in concert by the Defendants for the express purpose of circumventing and violating state usury laws, not only violates state usury and consumer protection laws, it constitutes a violation of 18 U.S.C. § 1962 (c)-(d) the Racketeer Influenced and Corrupt Organizations Act.

## II

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual Class Members exceed the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 putative class members as defined below; and there are numerous members of the proposed class who are citizens of a state different from Defendants.

21.     This Court has personal jurisdiction over Plaintiff because Plaintiff resides in this Court's jurisdiction.  This Court has personal jurisdiction over Defendants because each Defendant has conducted and continues to conduct substantial business in the District, and because Defendant has committed the acts and omissions complained of herein in the District.

22.     Venue as to Defendant is proper in this judicial district under 28 U.S.C § 1391 because Plaintiff resides within the District, and many of Defendant's acts complained of herein occurred within this district.

## III

## PARTIES

23.     Plaintiff Ronald Bethune is a resident and citizen of Yonkers, New York.  In or about June 2015, Plaintiff entered into a promissory note with Lending Club.  The material terms were that it was a loan for $33,250 ($35,000 less payment of a 5% or $1,725 origination fee) at 29.97% interest, payable in 60 equal monthly installments.  The amount of interest paid on the principal over the 5 year period was almost the same as the principal loaned to Plaintiff by LCC.

24.     Defendant LendingClub Corporation is a corporation which is incorporated in the state of Delaware, and is a citizen of, and has its principal place of business in, the city of San Francisco, California.

25.     Defendant WebBank is a Utah-chartered industrial bank with its principal place of business located at 215 South State Street, Suite 1000, Salt Lake City, Utah.

26.     Defendant Steel Partners Holdings; L.P.; is a limited partnership formed under the laws of the state of Delaware with its principal place of business located at 590 Madison Avenue, 32nd Floor, New York, NY 10022.

27.     Defendant Lending Club Members Trust is a trust organized under the laws of the state of Delaware.

28.     The true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by such fictitious names.  Each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the Defendants designated herein as DOES when such identities become known.

29.     Based upon information and belief, Plaintiff alleges that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned herein was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants.  In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## IV

## FACTUAL ALLEGATIONS

**A.     LendingClub's Business Model**

30.     As discussed above, LCC's eight billion dollar consumer lending business is designed around cutting out banks from the personal consumer loan process, instead utilizing an internet-based matching system where private investors make personal loans to borrowers, with LCC assuming the role of the bank to facilitate and service the loans.

31.     LCC was not a bank and was not subject to any banking regulatory oversight but assumed all of the non-funding aspects of a traditional consumer bank, such as:

a.   soliciting and marketed to consumers to submit consumer loan applications for funding;

b.   creating the consumer loan application (which gives LCC power of attorney) which consumers fill out to receive a loan;

c.   establishing the loan criteria for the consumer loans, including the type of loan, the amount of the loan, the information that must be submitted when applying for the loan, and the minimum credit criteria that the prospective borrower must meet to submit a loan request;

11

    d.   performing credit analyses on prospective borrowers to assess their

        creditworthiness;

    e.   setting interest rates for the loans based on the credit analyses;

    f.   setting the repayment terms for the borrowers' promissory notes;

    g.   generating and implementing the standardized borrowers' promissory notes.

32.     LCC then made the loan available to individual investors on its website, along with all other consumer loan requests, including all the material terms of the loan as set by LCC, credit information obtained by LCC, the length of the note, the interest rate, and a grading letter also determined by LCC.

33.     LCC has seven letter grades, from A through G, that it assigned to prospective borrowers based on LCC's analysis, as described in the preceding paragraphs.  An "A" grade resulted in the lowest interest rate and origination fee and a "G" grade resulted in the highest interest rate and origination fee.  The following diagram depicts the loan grades:

| Loan Grade | Interest Rate | Origination Fee | 24-Month APR | 36-Month APR | 60-Month APR |
|---|---|---|---|---|---|
| A | 5.32% - 7.89% | 1% - 5%* | 6.48% - 9.99% | 5.99% - 10.97% | 7.46% - 10.08% |
| B | 8.39% - 11.47% | 5% | | 11.92% - 15.06% | 10.59% - 13.74% |
| C | 11.99% - 15.31% | 6% | | 16.35% - 19.76% | 14.75% - 18.16% |
| D | 16.29% - 19.53% | 6% | | 20.76% - 24.09% | 19.17% - 22.51% |
| E | 19.99% - 24.37% | 6% | | 24.57% - 29.07% | 22.98% - 27.50% |
| F | 23.13% - 29.97% | 6% | | 27.79% - 34.84% | 26.22% - 33.28% |
| G | 27.34% - 31.89% | 6% | | 32.13% - 35.96% | 30.56% - 35.27% |

34.     From 2007 to the fourth quarter of 2015, approximately 30% of the loans facilitated through LCC were graded D through G with interest rates ranging between approximately 20% and 36%.

**LOAN PERFORMANCE DETAILS**

ISSUE DATE START 2007 ▾  Q1 ▾      ISSUE DATE END 2015 ▾  Q4 ▾      UNITS  Dollar amount ▾

| | TOTAL ISSUED | FULLY PAID | CURRENT | LATE | CHARGED OFF (NET) | PRINCIPAL PAYMENTS RECEIVED | INTEREST PAYMENTS RECEIVED | AVG. INTEREST RATE | ADJ. NET ANNUALIZED RETURN[1] |
|---|---|---|---|---|---|---|---|---|---|
| A | $2,078,372,925 | $563,644,251 | $998,960,497 | $5,530,824 | $21,362,504 | $1,052,588,575 | $136,038,994 | 7.26% | 5.55% |
| B | $3,469,578,325 | $957,402,758 | $1,650,886,559 | $19,691,612 | $84,950,018 | $1,714,049,768 | $361,615,084 | 10.79% | 7.60% |
| C | $3,554,923,375 | $813,506,803 | $1,856,165,221 | $42,643,716 | $140,384,962 | $1,515,729,203 | $484,841,764 | 14.01% | 8.81% |
| D | $2,156,190,750 | $489,427,362 | $1,100,669,968 | $40,409,237 | $134,886,941 | $880,224,465 | $366,676,672 | 17.20% | 9.01% |
| E | $1,270,669,575 | $262,283,321 | $675,328,776 | $33,690,656 | $102,772,924 | $458,877,165 | $250,356,995 | 19.94% | 9.24% |
| FG | $552,711,725 | $131,598,076 | $250,706,218 | $19,950,772 | $69,808,977 | $212,245,633 | $136,830,798 | 24.04% | 8.16% |
| All | $13,082,446,675 | $3,217,862,571 | $6,532,717,239 | $161,916,817 | $554,166,326 | $5,833,714,809 | $1,736,360,307 | 13.61% | 8.06% |

35.     LCC facilitated approximately $16 billion in consumer loans since its launch in 2007.

36.     LCC's primary source of revenue is the origination fee.  Indeed, in LCC's fourth quarter 2015 presentation to INVESTORs, LCC's Founder and CEO Renaud Laplanche stated that "Transaction fees, which are earned immediately after a loan is originated, represented roughly 85% of operating revenues and totaled $115.0 million, up 82% year over year."

37.     LCC's business model has been remarkably successful and has grown every quarter since 2013 with $2.5 billion in loans in the fourth quarter of 2015 alone.

B.      **The Role of WebBank**

38.     LCC advertises itself as generating revenue entirely on its own without the

involvement of any third-party entities.  For example, in LCC's fourth quarter 2014 year-end

earnings presentation, it graphically demonstrated "how we make money":



39.     Moreover, LCC also advertises that it is not deliberately structured to avoid being

regulated as a bank:



40.     LCC, in turn, advertises to consumers that by selecting LCC instead of a competitor, the consumer will receive savings when compared to a more traditional lender. These statements include:

- Lending Club is the world's largest online marketplace connecting borrowers and investors. We're transforming the banking system to make credit more affordable and investing more rewarding. We operate at a lower cost than traditional bank lending programs and pass the savings on to borrowers in the form of lower rates and to investors in the form of solid returns.[1]

- Lending Club uses technology to operate a credit marketplace at a lower cost than traditional bank loan programs, passing the savings on to borrowers in the form of lower rates and to investors in the form of solid returns. Borrowers who used a personal loan via Lending Club to consolidate debt or pay off high interest credit cards report in a survey that the interest rate on their loan was an

---

[1] *See* https://www.lendingclub.com/ (last visited Apr. 4, 2016).

average of 35% lower than they were paying on their outstanding debt or credit cards.[2]

- Lending Club is the world's largest marketplace connecting borrowers and investors, where consumers and small business owners lower the cost of their credit and enjoy a better experience than traditional bank lending, and investors earn attractive risk-adjusted returns.[3]

- We cut the cost and complexities of traditional bank loans and pass the savings on to borrowers.[4]

- We're committed to transparency.  We're proud to share information about our company and our services. Our website contains background information about Lending Club, and our statistics area gives a wealth of information on loan and investor performance. We also offer a downloadable file containing the credit and performance details on all loans eligible for funding by public investors.[5]

41.    In order for LCC to avoid classification as a bank and the accompanying regulatory oversight, LCC needed to create the illusion that a bank without usury rate limitations was lending the funds to the borrowers and not LCC.

42.    LCC selected Defendant WebBank to be the illusory bank to legitimize the otherwise usurious loans.

43.    Defendant WebBank, a Utah bank, is fully owned and controlled by Steel Partners Holdings, a non-financial institution entity.  As an industrial bank, also known as an industrial loan company, focused primarily on providing money to companies that arrange peer-to-peer loans, WebBank is exempt from much regulatory oversight and scrutiny.

44.    WebBank did not have bank officers perform the functions of a consumer bank in connection with its involvement with LCC.

---

[2] https://www.lendingclub.com/public/how-peer-lending-works.action (last visited Apr. 4, 2016).
[3] *Id.*
[4] *Id.*

16

45.     WebBank became a "pass through" sham party to all of LCC's transactions. WebBank acted as the funding agent and entered into the notes with the individual borrowers and then, within two business days, transferred the notes to LCC.  LCC would then transfer the investors' funding (which had already been secured before the note was funded to the consumer) to WebBank.

46.     Further evidence of WebBank being a sham party to the transaction is that in 2015, WebBank held only $226 million in assets while purportedly funding almost $4 billion in loans for LCC.

47.     To compensate WebBank for its involvement as a sham party to the lending transaction, LCC agreed to share some portion of the loan origination fee with WebBank.

48.     The inclusion of WebBank as a party to the transaction, and the resulting additional step in the lending process, provided absolutely no value to the consumer.  The only justification for this additional step was to create the façade of legitimacy to the usurious rates by claiming that the lending institution was WebBank which, being chartered in Utah, was not subject to usury laws.

49.     Generally, banks are able to circumvent state usury laws by legally exporting their own home state laws (where there are no statutory usury laws) to states that have usury laws.

50.     In *Madden v. Midland Funding, LLC*, the Second Circuit held that while banks that can legally export their usury-free laws to states with usury laws, once a nonbank purchases the bank's credit obligation, then it cannot continue to charge the usurious contractual interest rate.

---

[5] *Id.*

51.     As a result of the Second Circuit decision, LCC and WebBank announced a change of practice on February 26, 2016, whereby WebBank would suddenly "maintain[] an on-going economic interest in all loans made after they are sold."  LCC CEO Renaud Laplance stated that the *Madden* decision motivated LCC's "enhanced relationship" with WebBank.[6]  In short, now that the sham role of WebBank was revealed, LCC determined that WebBank needed to be more than a sham party to LCC's business model.

52.     In LCC's August 22, 2014, Prospectus titled "Member Payment Dependent Notes," LCC warns investors that "[i]f our platform was found to violate a state's usury laws, your investment may lose substantial value and you may lose all of the interest due on your Note." providing support that LCC intentionally created this model to circumvent state usury laws.

53.     The same Prospectus goes on to state: "Of the forty-six jurisdictions whose residents may obtain loans (including the District of Columbia), only seven states (Arizona, Nevada, New Hampshire, New Mexico, South Carolina, South Dakota and Utah) have no interest rate limitations on consumer loans, **while all other jurisdictions have a maximum rate less than the current maximum rate offered by WebBank through our platform**." (emphasis added).

54.     On August 8, 2015, LCC and analysts participated in a conference call to discuss its second quarter 2015 financial results.  During the call, CEO Renaud Laplance stated that he estimated "that roughly 12.5% of our platform's loan volume would exceed the interest rate caps in certain states."

---

[6] *See* http://www.prnewswire.com/news-releases/lending-club-enhances-relationship-with-issuing-bank-300226747.html (last visited Apr. 4, 2016).

55.     A table summarizing the general interest rate limitations set by states with usury laws is included below.

| State | Maximum Legal Interest Rate |
|---|---|
| Alabama | 8% |
| Alaska | 5% above the federal reserve rate |
| Arkansas | 5% above the federal discount rate on the date the loan agreement was entered into, 17% for consumer and personal loans |
| California | 10% |
| Colorado | 12% |
| Connecticut | 12% |
| Delaware | 5% above the federal discount rate on the date the loan agreement was entered into |
| District of Colombia | 24% |
| Florida | 18% |
| Georgia | 16% for loans under $3,000 and 5% per month for loans between $3,000 and $250,000 |
| Hawaii | 12% |
| Idaho | 12% |
| Illinois | 9% |
| Indiana | 25% |
| Iowa | 2% above the monthly average of the 10-year maturity interest rate of United States government notes and bonds |
| Kansas | 15% |
| Kentucky | the lesser between 19% or 4% above the 90-day commercial paper federal discount rate on the date the loan agreement was entered into for loans under $15,000.00 |

| State | Maximum Legal Interest Rate |
|---|---|
| Louisiana | 12% |
| Maine | 30% for loans of $2,000 or less, 24% for loans greater than $2,000 but less than $4,000, 18% for loans above $4,000 |
| Maryland | 8% |
| Massachusetts | 20% |
| Michigan | 7% |
| Minnesota | 8% |
| Mississippi | the greater of 10% or 5% above the federal discount rate on the date the loan agreement was entered into |
| Missouri | greater of 10% or 3% above the long term United States government bond yield |
| Montana | greater of 15% or 6% above the Federal Reserve prime rate |
| Nebraska | 16% |
| New Jersey | 16% |
| New York | 16% |
| North Carolina | the greater of 16% and 6% above the 6 month US treasury bills for loans under $25,000 |
| North Dakota | 5.5% above the 6 month US treasury bills rate |
| Ohio | 8% |
| Oklahoma | 10% |
| Oregon | greater of 12% or 5% above the federal discount rate for commercial paper on the date the loan agreement was entered into for loans under $50,000 |

| State | Maximum Legal Interest Rate |
|---|---|
| Pennsylvania | 6% for loans under $50,000 |
| Rhode Island | greater of 21% or 9% above the Wall Street Journal prime rate |
| Tennessee | lesser of 24% and 4% above the bank prime rate |
| Texas | 10% |
| Vermont | 12% |
| Virginia | 12% |
| Washington | greater of 12% or 4% above the 26 week treasury bill |
| West Virginia | 8% |
| Wisconsin | 12% |
| Wyoming | 10% |

**C.      How Plaintiff Bethune Was Provided an Usurious Loan**

56.      In or around June 2015, Plaintiff Bethune applied for a private consumer loan through LCC.

57.      Plaintiff submitted an application, and received a loan from LCC with a 29.97% interest rate shortly despite the fact that any consumer loans in New York cannot legally exceed 16% interest, pursuant to N.Y. Gen. Oblig. Law § 5-501.

58.      To the process of obtaining the loan, Plaintiff Bethune received standardized documents from LCC.

59.      Upon information and belief, every individual who receives a loan through LCC receives the same or substantial similar standardized documents.

60.      At no time did any of the advertising or contractual materials received by Plaintiff disclose that WebBank was a sham party to the transaction; that WebBank was a mere pass through entity; or that LCC engaged WebBank for the sole purpose of charging Plaintiff an interest rate in excess of New York's usury law.  Other than as a pass through entity, WebBank provided no traditional banking functions to Plaintiff.

61.      Plaintiff unknowingly entered into an unlawful and usurious contract with LCC and other Defendants, and, as a result, has been injured in the amount by the conduct of Defendants.

62.      Because the agreements signed by Plaintiff and the Class are unlawful and exceed the 16% interest rate cap in New York (and in each state that has enacted an interest rate limitation), the loan agreements between Plaintiff and the Class and LCC are void.

## IV

## CLASS ACTION ALLEGATIONS

63.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following classes:

> All persons or entities in the United States who reside in states with usury laws and were charged interest rates by Defendants in excess of their state's usury laws prior to February 26, 2016 (the "National Usury Laws Class").

> All persons or entities who reside in New York and were charged interest rates by Defendants in excess of the New York's usury law prior to February 26, 2016 (the "New York Class").

64.      Excluded from the above class are all persons or entities who reside in states without usury laws; Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly own subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members

22

and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

65.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

66.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

67.    **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes that there are tens of thousands of class members.  Inasmuch as the class members may be identified through business records regularly maintained by Defendant and its employees and agents, and through the media, the number and identities of class members can be ascertained.  Members of the Class can be notified of the pending action by e-mail, mail, and supplemented by published notice, if necessary.

68.    **Commonality and Predominance (Federal Rule of Civil Procedure 23(a)(2)** – There are questions of law and fact common to the Class.  These questions predominate over any questions affecting only individual class members.  These common legal and factual issues include, but are not limited to whether:

        a.   Defendants interest rates violate state usury laws;

        b.   Defendant WebBank is a "pass through" sham party to LCC's transactions with consumers;

        c.   WebBank serves any of the traditional banking functions with the consumer loans issued by LCC;

    d.   Defendants had a duty to disclose that WebBank was not a real party in interest to the consumer loans made by LCC;

    e.   Defendants intentionally circumvented state usury laws; and

    f.   Defendants violated state consumer protection laws;

    g.   Defendants violated the Racketeer Influenced And Corrupt Organizations Act; and

    h.   Plaintiff and Class are entitled to damages

69.    **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – The claims of the representative Plaintiff are typical of the claims of each member of the Class.  Plaintiff, like all other members of the Class, have sustained damages arising from Defendant's violations of the laws, as alleged herein.  The representative Plaintiff and the members of the Class were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Defendant.

70.    **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – The representative Plaintiff will fairly and adequately represent and protect the interests of the Class members and have retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Counsel for the Class are experienced class action counsel and will vigorously assert the claims of all Class members.

71.    **Superiority (Federal Rule of Civil Procedure 23(b)(3))** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), because questions of law and fact common to the Class predominate over the questions affecting only individual

members of the Class and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct. Further, it would be virtually impossible for the members of the Class to individually redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

72.     The Class Plaintiff contemplates the eventual issuance of notice to the proposed Class members setting forth the subject and nature of the instant action. Upon information and belief, Defendant's own business records and electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, the Class Plaintiff would contemplate the use of additional media and/or mailings.

73.     This action is properly maintained as a Class Action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

a.   Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

          i.        Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

          ii.        Adjudication with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests;

        b.  The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole; or

        c.  Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a Class Action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

          i.        The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

          ii.        The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

          iii.      The desirability or undesirability of concentrating the litigation of the claims in the particular forum;

          iv.      The difficulties likely to be encountered in the management of a Class Action.

V

**VIOLATIONS ALLEGED**

**FIRST CAUSE OF ACTION**

**VIOLATION OF N.Y. GEN. OBLIG. LAW § 5-501 (CIVIL USURY)**

**(New York Class)**

74.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

75.     Plaintiff and the Class members all received, signed, and executed loan agreements from Defendants.

76.     Under the terms of the loan agreements from Defendants, Plaintiff and the Class were to repay the principal loan balance to Defendants and were also charged an interest rate.

77.     New York Gen. Oblig. Law § 5-501 prohibits an individual lender from charging more than 16% interest on a loan to an individual borrower.

78.     Plaintiff received a 29.97% interest rate on his loan from Defendants, nearly double the maximum interest rate allowable pursuant to N.Y. Gen. Oblig. Law § 5-501.

79.     As a result of Defendants' usurious interest rate, Plaintiff has been injured.

80.     Plaintiff and the Class seek the return of all interest paid on their loans with Defendants and Defendants' forfeiture of any future interest payments due on Plaintiff's and the Class' loans.

## SECOND CAUSE OF ACTION

## VIOLATION OF INDIVIDUAL STATE CIVIL USURY LAWS

### (National Usury Laws Class)

81.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

82.     Plaintiff and the Class members all received, signed, and executed loan agreements from Defendants.

83.     Under the terms of the loan agreements from Defendants, Plaintiff and the Class were to repay the principal loan balance to Defendants and were also charged an interest rate.

84.     In the United States, each state has enacted a maximum general usury interest rate that can be charged by an individual lender to an individual borrower with the exception of Arizona, Nevada, New Hampshire, New Mexico, South Carolina, South Dakota and Utah.

85.     Upon information and belief, and as Plaintiff's experience demonstrates, Defendants are charging interest rates on loans that exceed the above interest rates and violate the states' usury laws.

86.     As a result of Defendants' usurious interest rate, the Class has been injured.

87.     Plaintiff and the Class seek the return of all interest paid on their loans with Defendants and Defendants' forfeiture of any future interest payments due on Plaintiff's and the Class' loans.

**THIRD CAUSE OF ACTION**

**VIOLATION OF 18 U.S.C. § 1962(C) THE RACKETEER INFLUENCED AND**

**CORRUPT ORGANIZATIONS ACT ("RICO")**

**(National Usury Laws Class)**

88.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

89.     As set forth above, in violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c).

**(i)     The Enterprise**

90.     As set forth above, Defendants LendingClub Corporation, WebBank, Steel Partners Holdings, and the Lending Club Members Trust having directed, contracted, and/or controlled the affairs of LCC, were aware of the nature and scope of LCC's unlawful scheme, and all agreed to participate in it.

91.     All Defendants are persons within the meaning of 18 U.S.C. § 1961(3)

92.     At all relevant times, as described herein, Defendants conducted the affairs of an association-in-fact enterprise, as that term is defined in 18 U.S.C. § 1961(4) (the "Enterprise"). The affairs of the Enterprise affected interstate commerce through a pattern of racketeering activity.

93.     The Enterprise is an ongoing, continuing group or unit of persons and entities. Specifically, in or around June 2015, Defendants funded a usurious loan to Plaintiff after Plaintiff applied for a loan through LCC.  Defendants failed to inform Plaintiff that WebBank would be a "pass through" sham party to the transaction for the sole purpose of charging Plaintiff

an interest rate in excess of New York's usury law and that the loan Plaintiff was receiving

would be at an interest rate that was nearly double the interest rate cap for such a loan in New

York.  Defendants' loan documents and advertising materials were designed so that consumers

who signed up for loans through Defendants were unaware as to the consequences of having

done so.

94.     Defendants associated together for the common purpose of limiting costs,

eliminating oversight, and maximizing each members' profits by engaging in the fraudulent

conduct described herein.  Specifically, the members of the Enterprise enticed tens of thousands

of consumers to sign up for loans through LCC, hoping that enough consumers would select

LCC for their loans without the fact that WebBank was a "pass through" sham party to the

transaction being brought to light making the loans illegal and usurious.  The purpose was to

allow Defendants to charge, and profit from, usurious interest rates to Plaintiff and members of

the Class, and to do so without regulatory oversight.

95.     While members of the Enterprise participate in and are part of the Enterprise, they

also have an existence separate and distinct from the Enterprise.  LCC solicits consumers to sign

up for loans through its website and WebBank is in the business of providing loans that LCC

buys after two days and parcels it out to investors who pledged to fund it.  Only by acting in

concert are Defendants able to effectuate the scheme described herein.  Specifically, LCC

assumes all the non-funding aspects of a traditional consumer bank while ensuring it is not

classified as a bank or subject to banking regulation oversight.  In order to reap additional profits

in the form of interest paid above each state's usury law limits, LCC brought in WebBank – a

bank chartered in a state with no usury interest rate limitation – as a sham party to the

transaction.  Only by including WebBank can Defendants reap these additional, unlawful profits.

30

96.     Defendants concealed the nature and existence of the Enterprise through their marketing and advertising materials, some of which are reproduced above.

97.     The Enterprise has a systemic linkage because Defendant LCC and Defendant WebBank through contractual relationships, agreements, and financial ties, including sharing fees collected by LCC.  Upon information and belief, the remaining Defendants also profited from the Enterprise by virtue of their relationship to either LCC (in the case of Lending Club Members Trust) or WebBank (in the case of Steel Partners Holdings).

98.     LCC and WebBank controlled and directed the affairs of the Enterprise and used other members of the Enterprise as instrumentalities to carry out the fraudulent conduct described herein.

**(ii)     The Predicate Acts**

99.     Defendants' systematic scheme to charge usurious interest rates, as described above, was facilitated by the use of the United States mail and wire.

100.     Each of these omissions and/or misrepresentations constituted an act of mail and/or wire fraud for purposes of 18 U.S.C. § 1341.

101.     Additionally, by using the internet, telephone, and facsimile transmissions to communicate false and misleading information about the loans to customers in order to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of 18 U.S.C. § 1343.

102.     The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c).  In particular, each marketing material and contract provided to Plaintiff and the Class was a racketeering activity separate from the Enterprise.  Plaintiff has been subjected to Defendants' acts through receiving marketing

material and contracts, and entering an illegal and usurious contract through the mail and internet, and as a result has paid interest amounts in excess of New York's usury law.

103.    All of the predicate acts of racketeering activity described herein are part of the nexus of affairs and functions of the Enterprise.  The racketeering acts were committed by the Enterprise employed a similar method, were related, had a similar purpose, involved similar participants (LCC, WebBank, Steel Partners Holdings, and the Lending Club Members Trust), and resulted in a similar impact on Plaintiff and members of the Class.

104.    As a direct and proximate result of these violations of 18 U.S.C. § 1962(c) and (d), Plaintiff and members of the Class have suffered substantial damages and been injured in their business or property by the predicate acts which make up Defendants' pattern of racketeering activity that comprises Defendants deliberate and unlawful usury law violation scheme.

105.    Defendants are liable to Plaintiff and members of the Class for treble damages, together with all costs of this action, plus reasonable attorneys' fees and costs under 18 U.S.C. §§ 1964(c) and (d).

## FOURTH CAUSE OF ACTION

## VIOLATION OF 18 U.S.C. § 1962(D) THE RACKETEER INFLUENCED AND

## CORRUPT ORGANIZATIONS ACT ("RICO")

### (National Usury Laws Class)

106.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

107.    As set forth in the paragraphs incorporated by reference from above, in violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c).

108.    Defendants, having directed and controlled the affairs of the Enterprise, were aware of the nature and scope of the Enterprise's unlawful scheme and all agreed to participate in it.

109.    As a direct and proximate result of these violations of 18 U.S.C. § 1962(c) and (d), Plaintiff and members of the Class have suffered substantial damages and been injured in their business or property by the predicate acts which make up Defendants' pattern of racketeering activity that comprises Defendants deliberate and unlawful usury law violation scheme.

110.    Defendants are liable to Plaintiff and members of the Class for treble damages, together with all costs of this action, plus reasonable attorneys' fees and costs under 18 U.S.C. §§ 1964(c) and (d).

**FIFTH CAUSE OF ACTION**

**VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 349**

**(New York Class)**

111.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

112.    N.Y. Gen. Bus. Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

113.    LCC's failed to disclose that the interest rates on Plaintiff's and the Class members' loans were usurious and that WebBank was a pass-through sham party to the transaction between Plaintiff and the Class and LCC included solely for the purpose of charging usurious interest rates.

114.    LCC's applications, agreements, and advertisements were deceptive and misleading because they would mislead a reasonable consumer, such as Plaintiff, into believing that the usurious interest rate on a loan facilitated by LCC was lawful when, in fact, the interest rate was unlawful.

115.    As a result of LCC's unlawful, false, deceptive, and misleading conduct, Plaintiff and the Class members have suffered an ascertainable loss in the form of direct monetary losses.

116.    A causal relationship exists between LCC's unlawful, false, deceptive, and misleading conduct and Plaintiff's and the Class members' injuries.  Had LCC not engaged in the aforementioned conduct, Plaintiff and the Class members would not have signed up for loans through LCC.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, demands judgment against and general and special relief from Defendant as follows:

1.    An order certifying that the action may be maintained as a Class Action as defined herein and appointing Plaintiff and his counsel of record to represent the defined Class;

2.    An order that Defendants are permanently enjoined from their improper conduct and practices as alleged;

3.    A judgment awarding Plaintiffs and Class and Subclass members restitution, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that Defendants obtained as a result of their unlawful, unfair, and fraudulent business practices and conduct;

4.    A judgment awarding Plaintiffs and Class and Subclass members actual damages, under all claims for relief where such damages are available

34

5.      A judgment awarding Plaintiffs and Class and Subclass members exemplary

damages for Defendant's knowing, willful, and intentional conduct;

6.      For reasonable attorney's fees and costs, pursuant to and other statutes as may be

applicable;

7.      For prejudgment interest to the extent allowed by law;

8.      For costs of suit incurred herein; and

9.      For such other and further relief as the Court deems appropriate.

DATED:  April 6, 2016.                    **MCCUNEWRIGHT, LLP**


                                          BY:    _/s/ Mitchell Breit_

                                                 Mitchell Breit
                                                 **SIMMONS HANLY CONROY LLC**
                                                 112 Madison Avenue
                                                 New York, NY 10016-7416
                                                 Telephone: (212) 784-6400
                                                 Facsimile: (212) 213-5949
                                                 Email: mbreit@simmonsfirm.com

                                                 Stephen Larson (*pro hac vice* pending)
                                                 Steven Haskins (*pro hac vice* pending)
                                                 **LARSON O'BRIEN LLP**
                                                 555 South Flower Street
                                                 Suite 4400
                                                 Los Angeles, CA 90071
                                                 Telephone: (213) 436-4888
                                                 Facsimile: (213) 623-2000
                                                 Email: slarson@larsonobrienlaw.com
                                                 shaskins@larsonobrienlaw.com

                                                 Richard D. McCune (*pro hac vice* pending)
                                                 David C. Wright (*pro hac vice* pending)
                                                 Elaine S. Kusel
                                                 **MCCUNEWRIGHT LLP**
                                                 2068 Orange Tree Lane
                                                 Suite 216
                                                 Redlands, CA 92374
                                                 Telephone: (909) 557-1250

Facsimile: (909) 557-1275
Email: rdm@mccunewright.com
dcw@mccunewright.com
esk@mccunewright.com

Joseph G. Sauder (*pro hac vice* pending)
Matthew D. Schelkopf (*pro hac vice* pending)
Joseph B. Kenney (*pro hac vice* pending)
**MCCUNEWRIGHT LLP**
1055 Westlakes Drive
Suite 300
Berwyn, PA 19312
Telephone: (610) 200-0580
Facsimile: (610) 727-4001
Email: jgs@mccunewright.com
mds@mccunewright.com
jbk@mccunewright.com

*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

DATED:  April 6, 2016                    **SIMMONS HANLY CONROY LLC**

BY:    */s/ Mitchell Breit*
           Mitchell Breit

36